1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| BRYAN EDWARD MAZZA, | ) | No. C 14-1644 RMW (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS; |
| v. | ) | DENYING CERTIFICATE OF |
| | ) | APPEALABILITY |
| WARDEN ERIC ARNOLD, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

16
17

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus

18
pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition

19
should not be granted.  Respondent has filed an answer addressing the merits of the petition.

20
Although given an opportunity, petitioner has not filed a traverse.  After a review of the record,

21
the court concludes that petitioner is not entitled to relief based on the claims presented and

22
DENIES the petition.

23

**BACKGROUND**

24

Petitioner was convicted by a jury of several armed robberies and attempted armed

25
robberies in Contra Costa County.  The trial court sentenced petitioner to a term of 35 years and

26
eight months in state prison.  On appeal, the California Court of Appeal affirmed the convictions,

27
but reversed and remanded the sentence for the trial court to correct its order striking petitioner's

28

1    three prior strike convictions.  The California Supreme Court denied a petition for review.

2    Petitioner filed the instant federal habeas petition on April 10, 2014.

3           At trial, the prosecution put on evidence that petitioner robbed or attempted to rob four

4    businesses in Contra Costa County.  The first two occurred on October 11, 2005.  The latter two

5    occurred on October 13, 2005.

6           Regarding the first business, the prosecution presented evidence that on October 11,

7    2005, around 4:00 p.m., Kenny Haynes, a supervisor at Round Table Pizza in Concord,

8    California, was behind the counter at the restaurant.  A tan Caucasian man with muscular arms,

9    around 5'11" tall, wearing black, tinted sunglasses, a red 49ers jersey, and a straw hat

10   approached the counter.  The man told Haynes to keep his hands visible, and showed Haynes a

11   black .22 caliber revolved underneath his shirt.  The man asked Haynes, "Do you see this?" and

12   directed Haynes to empty the two cash registers and put the cash into a white plastic bag that the

13   man gave to Haynes.  Haynes complied, and as the man left, Haynes watched the man drive

14   away in a silver or gray Pontiac.  Haynes believes the Pontiac was a Grand Am.

15          At trial, Haynes identified a photograph of petitioner's car.  When Haynes spoke with

16   Police Officer Summer Galer after the incident, Haynes told Galer that the man was Hispanic or

17   dark-complected, 28-34 years old, around 6'2" in height, buff, with straight teeth and an

18   unshaven face.  Haynes also told Galer that the man was wearing a red 49ers jersey.  Two weeks

19   later, Haynes identified petitioner in a photographic lineup as the man who robbed the Round

20   Table Pizza.  Haynes then identified petitioner as the robber at both the preliminary hearing and

21   at trial.

22          Regarding the second business, the prosecution presented evidence that on October 11,

23   2005, around 4:00 p.m. or 4:30 p.m., Joseph McLaughlin, an employee at Peggs Grill in

24   Martinez, was working at the cash register when he saw a dark-skinned Caucasian man with a

25   muscular, stocky build, come in and sit near the cash register.  The man wore a mesh-like zip-up

26   shirt, "police-like" sunglasses, and a straw hat.  The man ordered and paid for a coffee, but when

27   McLaughlin opened the cash register, the man lifted his shirt and displayed a handgun.  The man

28   twice demanded money, but McLaughlin refused.  When the man tried reaching for the money,

McLaughlin slammed the drawer shut and threw hot coffee at McLaughlin.  The man ran out of the door, but returned quickly to use his shirt to wipe the door handle.  McLaughlin described the man to the police, and two weeks later, McLaughlin picked petitioner's photograph out of a lineup and was sure that petitioner was the robber.  McLaughlin also identified petitioner at the preliminary hearing, but did not recognize petitioner at trial.  Three other witnesses who were also outside of Peggs Grill around that time testified at trial, giving similar descriptions of a man getting into a silver or gray Pontiac Grand Am.

Regarding the third business, the prosecution presented evidence that on October 13, 2005, Brett Mathews was standing outside the Rasputin Records store in Pleasant Hill.  Mathews saw a silver or gray Pontiac Grand Am parked about 18 feet away from him.  A man got out of the car and walked to the store's front door.  As the man was walking, the man pulled out a bright or medium blue ski mask over his face from a darker blue knit regular beanie.  The man had a handgun in his waistband.  The man pushed against the door even though the door had a sign on it that indicated "pull."  When the door did not open, the man ran back to his car.  Mathews followed the man in his own car but could not make out of the license plate.  Mathews reported that the man was a white male, around 28 years old, 6'2" tall, and had a large tribal tattoo design on his right calf.  Almost two weeks later, Mathews identified petitioner in a photographic lineup as the man he followed.  Mathews also identified petitioner at the preliminary hearing as well as at trial.

Regarding the fourth business, the prosecution presented evidence that on October 13, 2005, Kenny Ly and Trung Howard Ly were working at their Concord restaurant, called Paradise 33.  Around 3:30 that afternoon, Kenny was sitting near the cash register when he noticed a silver Pontiac parked in the red zone with a scratched-up license plate.  Kenny saw a man with light-colored skin and almost shoulder-length, wavy hair get out of the driver's side of the car.  Another man was sitting in the passenger seat.  Kenny watched the man pull a brown mask out of his pocket and put it over his head.  The man entered the restaurant, pulled out a handgun, pointed it at Kenny and demanded all the money.  Kenny saw a tattoo between the man's elbow and wrist.  Kenny took a few hundred dollars from the cash register and handed

them to the man, who took it with his left hand.  Kenny thought he saw the man's trigger finger move, and stepped to the side.  The gun went off, and Kenny felt something touch the skin on top of his arm, and heard glass breaking behind him.

In the meantime, Trung had noticed the man wearing the mask pointing a silver handgun at Kenny.  Trung also saw that the man had a tattoo on his right forearm.  Trung snuck up behind the man and, after Kenny gave the bills to the man, Trung hit the man in the back of his head with a soup bowl and then ran to the back of the kitchen so he would not get shot.  The man stumbled, left the restaurant, and got into the passenger side of the car while another man drove them away.  Neither Trung or Kenny identified petitioner at trial.  Petitioner showed his right forearm to the jury, and it was not tattooed.  Kenny testified that he knew one of the witnesses who testified about the Peggs Grill robbery, and the two had discussed the case previously.

In the early morning of October 15, 2006, Police Officer John Metz noticed an unoccupied silver Pontiac Grand Am and discovered it was a rental car.  Metz called for backup and began searching around the houses in the area, which were under construction.  Inside one of the houses, Metz found a small fanny pack containing a dark-colored, six-shot revolve with five live rounds and one expended round, a box of ammunition, and a pair of clear plastic gloves.  A police dog identified that the owner of the fanny pack had touched the silver Pontiac Grand Am.  Metz saw someone come out of the houses and head toward the Pontiac.  Even after the person began to drive the Pontiac away and Metz announced himself and ordered the drive to stop, the driver, who was petitioner, did not comply.  Petitioner was eventually caught and handcuffed.  Metz found over $3,300 in bills on petitioner.  Petitioner was arrested for being a felon in possession of a knife.

Upon a search of the Pontiac, police found, among other things, a gun holster, a dark knit cap with the eyeholes cut out, a blue knitted ski mask, a straw hat, and two pairs of sunglasses.  Petitioner's ex-girlfriend, Christine Cronin, testified that she and petitioner ended their relationship in September 2005.  She also testified that on October 13, 2005, around 5:30 p.m., she was with petitioner and when he took off his baseball cap, she noticed a fresh, large gash on

1  the back of his skull.  She cleaned the wound.  She also testified that the fanny pack found by
2  police belonged to petitioner.
3          In an unauthorized recording of a conversation at the jail between petitioner and Cronin,
4  petitioner stated that he did not remember robbing anything, but he knew enough to wear gloves
5  and a mask.  Petitioner admitted that although he was trying to get rid of the gun, "they" found it.
6  Police criminalists gave contradicting testimony regarding whether the masks found had
7  evidence of blood.  DNA samples were also taken from the mouth area of the masks and there
8  were 15 out of 15 loci that matched petitioner from the first mask, and 14 out of 15 for the
9  second mask.  A test-fire of the revolver found the fanny pack, compared to the bullet found in
10 the wall of the Paradise 33 restaurant had the same left-handed twist, which is used by less than
11 5% of manufacturers.
12         The defense also presented evidence.
13         They jury convicted petitioner of the following:  (1) regarding Round Table Pizza,
14 second degree robbery of Kenny Haynes on October 11, 2005 with a personal use of a firearm
15 enhancement; (2) regarding Peggs Grill, attempted second degree robbery of Joseph McLaughlin
16 and John Doe with a personal use of a firearm enhancement; (3) felon in possession of a firearm
17 on October 11, 2005; (4) regarding Rasputin Records, attempted second degree robbery on
18 October 13, 2005 with a personal use of a firearm enhancement; (5) and (6) regarding Paradise
19 33, second degree robberies on October 13, 2005 of Kenny Ly and Van Pham with intentional
20 and personal discharge of a firearm enhancement; and (7) felon in possession of a firearm on
21 October 13, 2005.  The jury found petitioner not guilty of the attempted murder of Kenny Ly
22 with an intentional and personal discharge of a firearm enhancement.  Petitioner moved for a
23 new trial on Counts 5 and 6 regarding Paradise 33, and the court granted the motion on the
24 ground that the verdicts were contrary to the evidence.  Upon the State's motion, the court
25 dismissed Counts 5 and 6.
26                                    **DISCUSSION**
27 A.    Standard of Review
28         This court may entertain a petition for writ of habeas corpus "in behalf of a person in

1  custody pursuant to the judgment of a state court only on the ground that he is in custody in

2  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

3  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

4  may not grant a petition challenging a state conviction or sentence on the basis of a claim that

5  was reviewed on the merits in state court unless the state court's adjudication of the claim

6  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

7  clearly established federal law, as determined by the Supreme Court of the United States; or

8  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

9  the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong

10 applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529

11 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual

12 determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

13      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

14 court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15 law or if the state court decides a case differently than [the] Court has on a set of materially

16 indistinguishable facts." Williams, 529 U.S. at 412-13.  A state court decision is an

17 "unreasonable application of" Supreme Court authority, falling under the second clause of

18 § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

19 Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

20 case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because

21 that court concludes in its independent judgment that the relevant state-court decision applied

22 clearly established federal law erroneously or incorrectly." Id. at 411.

23      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

24 will not be overturned on factual grounds unless objectively unreasonable in light of the

25 evidence presented in the state-court proceeding."  Miller-El, 537 U.S. at 340.

26      In determining whether the state court's decision is contrary to, or involved an

27 unreasonable application of, clearly established federal law, a federal court looks to the decision

28 of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

1  LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000).  Here, that decision is the California

2  Court of Appeal.

3  B.      Petitioner's Claims

4          As grounds for federal habeas relief petitioner claims that:  (1) the trial court's denial of

5  petitioner's motion to sever violated petitioner's right to a fair trial; (2) the prosecutor committed

6  misconduct; and (3) counsel rendered ineffective assistance by failing to object to the

7  prosecutorial misconduct.

8          1.      Right to Fair Trial - Motion to Sever

9          Prior to trial, petitioner moved to sever Counts 1-3, the incidents occurring on October

10  11, 2005, from Counts 4-7, the incidents occurring on October 13, 2005.  Petitioner argues that

11  the failure to sever these counts substantially prejudiced him and denied him a fair trial.

12  Specifically, petitioner alleges that the evidence from the four incidents was not cross-admissible

13  to show common plan or intent, or to show identity; the trial court did not instruct the jury that

14  the evidence was not cross-admissible; and the evidence of petitioner's identity as the perpetrator

15  at Paradise 33 was weak, but the incident was inflammatory.

16          The California Court of Appeal rejected petitioner's claim:

17              "'[E]ven if a trial court's ruling on a motion to sever is correct at the
                time it was made, a reviewing court still must determine whether, in the end, the
18              joinder of counts . . . for trial resulted in gross unfairness depriving the
                defendant of due process of law.'"  (Soper, supra, 45 Cal.4th at p. 783.)  To
19              make this determination, we look at the evidence actually introduced at trial.
                (People v. Bean (1988) 46 Cal.3d 919, 940.)  "[D]efendant must demonstrate a
20              reasonable probability that the joinder affected the jury's verdicts."  (People v.
                Grant (2003) 113 Cal. App. 4th 579, 588 (Grant), citing Bean, at pp. 938-940.)

21
                    Defendant makes several arguments why denial of his motion to sever
22              resulted in gross unfairness, thereby depriving him of due process.  Relying
                primarily on Grant, defendant contends that gross unfairness occurred because
23              the evidence of the four incidents was not cross-admissible on the issue of
                identity, the prosecutor argued this impermissible inference in closing, the trial
24              court denied his request to instruct the jury that the evidence was not cross-
                admissible, and evidence of defendant's identity as the robber of Paradise 33
25              was particularly weak.

26                  The People, relying heavily on Soper, respond that the evidence was
                cross-admissible and, even assuming for the sake of argument that it was not,
27              the prosecutor's inferences about the evidence and the trial court's refusal to
                instruct the jury that the evidence was not cross-admissible, "standing alone . . .
28              does not establish gross unfairness depriving defendant of due process."

1    (<u>Soper</u>, supra, 45 Cal.4th at pp. 783-784.)

2         We agree with the People, and conclude the facts and circumstances of
     this case are analogous to those considered by our Supreme Court in <u>Soper</u>, in
3    which the court rejected a similar due process argument.  As in that case,
     various factors lead us to conclude that defendant has not met his high burden of
4    establishing that the trial was grossly unfair and that he was denied due process
     of law.
5
          First, as did the <u>Soper</u> court, we assume for the sake of argument that the
6    evidence at issue was not cross-admissible on the issue of identity and consider
     that the jury was not instructed as requested by the defense.  (<u>Soper</u>, supra, 45
7    Cal.4th at p. 783.)  However, this is only a factor in our assessment; "standing
     alone the absence of such a limiting instruction does not establish gross
8    unfairness depriving defendant of due process."  (<u>Ibid.</u>)

9         Furthermore, "[a]ppellate courts have found "'no prejudicial effect from
     joinder when the evidence of each crime is simple and distinct, even though
10   such evidence might not have been admissible in separate trials.'""  (<u>Soper</u>,
     <u>supra</u>, 45 Cal.4th at p. 784.)  Here, we agree with the People that the evidence
11   supporting the Round Table Pizza, Peggs Grill, and Rasputin Records crimes
     were "relatively straightforward and distinct" and that "the evidence related to
12   each charge was independently ample to support defendant's conviction" of
     each of these crimes.  (<u>Ibid.</u>)
13
          Defendant contends that the evidence that he committed the Rasputin
14   Records attempted robbery was much stronger than the evidence regarding the
     Round Table Pizza and Peggs Grill incidents, and that these latter two incidents
15   were similar.  We disagree.  As our review of the trial evidence indicates, the
     evidence for these latter two incidents was distinct, straightforward, had
16   considerable strength, and was not effectively disputed by the defense.

17        Most notably, Haynes, the Round Table Pizza victim, gave consistent,
     detailed descriptions of the robber over time, saw him drive away in what he
18   thought was a gray or silver Pontiac Grand Am, and readily identified defendant
     from a photographic lineup, describing the photo as a "dead-on match."  Haynes
19   identified defendant at the preliminary hearing and at the trial, and stated he was
     "100 percent" certain of his identification.
20
          McLaughlin, the Peggs Grill victim, also gave a detailed description of
21   the robber who confronted him.  He identified defendant's photograph without
     qualification when shown a photographic lineup by police, and identified
22   defendant as the robber at the 2006 preliminary hearing.  While at the 2009 trial
     he said he did not recognize defendant and did not know if he was the same man
23   he identified at the preliminary hearing, he also testified that he believed he
     identified the robber at the preliminary hearing.  In addition, Dan and Carolyn
24   Mello saw the robber leaving Peggs Grill.  Dan testified that, although he did
     not get a good look at the man, he saw him get into a silver or gray Pontiac
25   Grand Am.  Carolyn, although she was not sure, identified defendant as the
     robber in a photographic lineup and at trial.
26
          Furthermore, the trial court instructed the jury that "[e]ach of the counts
27   charged in this case is a separate crime.  You must consider each count
     separately and return a separate verdict for each one."  We agree with the
28   People that this instruction "mitigated the risk of any prejudicial spillover . . . ."

(Soper, supra, 45 Cal.4th at p. 784.)

We also agree with the People that any conceivable prejudice regarding the Paradise 33 counts was remedied by the jury's acquittal of defendant on the attempted murder charge and the court's grant of a new trial on the robbery and attempted robbery convictions related to the Paradise 33 incident.  Defendant argues that this did not alleviate the potential prejudice caused by the inflammatory nature of the Paradise 33 evidence, given the weakness of that evidence against defendant.  As we have discussed, however, there was ample evidence against defendant regarding the other three incidents, and the Paradise 33 evidence was not particularly inflammatory in light of defendant's display of a gun and use of it in a threatening fashion in all four incidents.

Finally, defendant points to several statements by the prosecutor in closing argument that he contends were prejudicial.  Defendant cites to the following: the prosecutor called the incidents a "robbery spree"; argued that "all of the evidence, all of the pieces that have come before you here are interconnected"; contended that defendant used a gun in a menacing manner at Round Table Pizza in "exactly the same menacing manner he used it at Peggs"; referred to the consistent descriptions of the perpetrator provided by the witnesses in all four incidents and talked about how they all narrowed to point to defendant; and said that the incidents corroborated each other by the fact that the witnesses identified defendant.  We disagree that, given the record as a whole, these statements had a prejudicial impact on the jury's deliberations.

Grant, relied on heavily by defendant, is not persuasive authority because it involved facts and circumstances significantly different from those of the present case.  The evidence of one of the counts reviewed by the court was particularly weak; the prosecutor directly urged the jury to draw the impermissible inference that, because defendant committed one count, for which there was much stronger evidence, he committed the other, for which the evidence was weaker and largely circumstantial; and, although the trial court appears to have given a jury instruction similar to the ameliorative one given in the present case, the court also made a statement to the jury suggesting it could use the evidence as it saw fit.  (Grant, supra, 113 Cal. App. 4th at pp. 588, 589-590, 591-592, 592, fn. 8.)

In short, considering the record as a whole, defendant has not shown there is a "reasonable probability that the joinder affected the jury's verdicts" (Grant, supra, 113 Cal. App. 4th at p. 588) and "has not met his high burden of establishing that the trial court was grossly unfair and that he was denied due process of law."  (Soper, supra, 45 Cal.4th at p. 783.)

(Pet., Ex. 1 at 21-24.)

A joinder, or denial of severance, of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  To prevail on a claim that the denial of a severance motion was erroneous, the petitioner must demonstrate that the state court's decision resulted in prejudice great enough to render his trial fundamentally unfair.  Id.  In addition, the impermissible joinder

1  must have had a substantial and injurious effect or influence in determining the jury's verdict.

2  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

3         Here, petitioner's only citation to federal law in his brief is to United States v. Lane, 474

4  U.S. 438 (1986).  However, Lane is not "clearly established Supreme Court law," providing a

5  standard of when the denial of a motion to sever claims violates due process.  Lane was decided

6  on direct review, and involved the rules for joinder under the Federal Rules of Criminal

7  Procedure.  See Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir. 2010).  The court cannot find

8  any clearly established Supreme Court law which addresses petitioner's claim.  Thus, the state

9  court's decision rejecting petitioner's argument cannot be contrary to, or an unreasonable

10  application of, clearly established federal law.  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

11        Alternatively, even assuming that the denial of the severance motion was constitutional

12  error, petitioner cannot demonstrate that such an error had a substantial or injurious effect on the

13  verdict.  Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507

14  U.S. 619, 638 (1993)).  Joinder generally does not result in prejudice if the evidence of each

15  crime is simple and distinct, even if the evidence is not cross admissible, and the jury is properly

16  instructed so that it may compartmentalize the evidence.  See Bean v. Calderon, 163 F.3d 1073,

17  1085-86 (9th Cir. 1998).  Here, the state court reasonably concluded that evidence of each of the

18  four incidents was simple and distinct.  In addition, the trial court instructed the jury to consider

19  each count separately, and reminded the jury that each count was a separate crime.  Finally, the

20  fact that the jury did not convict petitioner of attempted murder at Paradise 33, but did convict

21  petitioner of the robberies and attempted robberies leads the court to conclude that the jury was

22  able to differentiate and compartmentalize each separate crime.  See Park v. California, 202 F.3d

23  1146, 1149-50 (9th Cir. 2000).

24        Accordingly, petitioner is not entitled to habeas relief.

25        2.      Prosecutorial Misconduct

26        Petitioner claims that the prosecutor committed misconduct by: (1) misstating the burden

27  of proof; (2) likening the jury's task to ordinary and reasonable decisions; (3) maligning defense

28  counsel; (4) eliciting improper evidence; and (5) violating court rulings and arguing facts not in

1    evidence.  The court discusses each allegation in turn.

2              A.      Misstating the burden of proof

3        During rebuttal argument, the prosecutor used a "cat puzzle" analogy to describe to the

4    jury how to approach the evidence.  The California Court of Appeal summarized it as follows:

5              **a. Prosecutor's Use of the Puzzle at the Beginning of Rebuttal**

6              The prosecutor first displayed that part of the puzzle that was a portion
         of a cat's tail to the jury.  His comments indicated it was impossible to tell what
7        the piece was, joking that it might be the "Loch Ness monster."  He said, "If I
         asked the 12 of you to go back in the deliberation room right now, right now
8        and render a verdict on what this is, it would be easy.  You would have to vote
         not guilty because we don't know what we are looking at, so let's put it aside for
9        a second."

10             The prosecutor then displayed a portion of the puzzle that showed cat
         ears and suggested that, while it might give the jury some ideas, it was the
11       "[s]ame deal.  I send you back in the jury room, the 12 of you are going to have
         a great laugh and throw your hands up and go I don't know what that is."

12
               The prosecutor next displayed the portion of the puzzle that showed two
13       legs.  He indicated that the jurors might now have some idea what the puzzle
         depicted, such as a "really fat squirrel" or "a child's skinny boot," but that it
14       would still be difficult to deliberate about it.

15             The prosecutor placed another portion of the puzzle that showed an
         additional two legs.  Again, he stated that the jury still did not have enough
16       information to render a verdict about what the puzzle depicted.

17             Next, the prosecutor displayed a portion of the puzzle showing the body
         of a cat.  He said, "Now I think we are getting somewhere.  You sort of
18       recognize what we might be looking at here. But it could be a stuffed animal or
         even a fur coat. . . .  Still can't makeup [sic] your mind based on this one piece,
19       but you know what you can do?  You can take the pieces and put them together.

20             As the prosecutor presented each portion of the puzzle, he used magnets
         to attach them to a board before displaying the next piece.  Next, the prosecutor
21       displayed the full image of a cat.  He stated:  "Now, this would have been a
         heck of a lot easier if I just stood up and showed you this picture.  All right?
22       That's a picture of a cat.  That's easy.  All right.  Mr. Feinberg [prosecutor],
         what [does] a cat have to do with a criminal jury trial?

23
               "When you do a jury trial, you don't have just one big aha moment
24       where I lift up the board and say here is all the evidence on this one board, go.
         The evidence is presented to you in pieces because there is only one witness
25       chair there.  There is only one space for one person, one at a time.  One piece of
         physical evidence at a time.  One piece of testimony at a time.  One ruling at a
26       time. Ms. Barker [defense counsel] wants you to take the cat apart and look at
         each piece individually and start throwing it out the window.  She wants you to
27       do that under the guise of the circumstantial evidence instructions.  Now, she is
         correct, actually correct, about what to do if there are two reasonable
28       interpretations.  But you don't do that in a vacuum one piece of evidence at a

time. I'm not asking you to render a verdict based on this, the Loch Ness monster."

Defense counsel objected that the prosecutor was misstating the jury instruction, but the court overruled the objection. The prosecutor then stated:

"I'm asking you, ladies and gentlemen, to consider all the evidence that has been presented to you and put all the evidence together when looking at it. Yeah, sure. He could maybe sort of possibly have a reasonable explanation for where that cash came from. That was Item No. 1. You must just disregard the cash because there could be a reasonable explanation. Forget for a moment that we don't know when he came into possession of any of that legitimate source of money. Set that aside for a second. She [defense counsel] wants you to say, look, people have money for legitimate reasons. Throw the tail out. Don't throw the tail out, you don't know what the tail has to do with anything yet.

"Same for his refusal in the lineup. That was Item No. 2. We don't know what it could mean. It could mean a lot of different things. Take the legs and throw them out, Mr. Feinberg.

"That conversation with Christine Cronin, it is just a front paw, it could be anything. That resisting arrest, it is just – it is just ears up here, we don't know what it means. Throw it out.

"Well, Ms. Barker wants you to throw every part of the cat out so we are left with an empty board. That's not what your job is. You are supposed to look at the evidence, all of it. And look, four years later maybe the pieces don't fit quite as tightly as they did when that was first cut up, but it doesn't mean that we are not looking at a cat. And you know that because you have common sense. You have common sense when you look at the whole picture and you are patient enough to wait for weeks and weeks and weeks while the rest of the cat came into focus. That is what a cat has to do with robbery."

**b. The Prosecutor's Further Use of the Puzzle**

Later in his rebuttal, the prosecutor returned to the cat puzzle, using it to analyze the statement from the Rasputin Records witness, Brett Mathews, who said that he had seen defendant with a tattoo on one of his calves, but gave inconsistent statements about which calf was tattooed: "The fact he was uncertain as to which leg the tattoo was on is not reasonable doubt. No more so than if you cut off a whisker from the cat and try to say, well, well, well, let's take a little tiny microscopic thing out of here and make it reasonable doubt."

(Pet., Ex. 1 at 26-28.)

The state appellate court rejected petitioner's claim and stated that the prosecutor did not use the cat puzzle analogy in an impermissible way. The prosecutor instead analogized the cat puzzle pieces to circumstantial evidence, and emphasized only that the jury should consider all the evidence in reaching a verdict.

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate

1    standard of review is the narrow one of due process and not the broad exercise of supervisory

2    power.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are

3    violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id.  Under

4    Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next

5    question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d

6    1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014)

7    (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper

8    comments for AEDPA review purposes).

9         As to the beginning of the prosecutor's rebuttal in which he was explaining the pieces of

10   the cat puzzle, petitioner objected to that argument as a misstatement of the jury instructions.

11   However, a prosecutor's mischaracterization of a jury instruction is less likely to render a trial

12   fundamentally unfair than if the trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a jury than do
> instructions from the court.  The former are not evidence, and are likely viewed as
> the statements of advocates; the latter, we have often emphasized, are viewed as
> definitive and binding statements of the law.  Arguments of counsel which
> misstate the law are subject to objection and to correction by the court.  This is
> not to say that prosecutorial misrepresentations may never have a decisive effect
> on the jury, but only that they are not to be judged as having the same force as an
> instruction from the court.

Boyde v. California, 494 U.S. 370, 384-85 (1989) (citations omitted).  Here, not only was the

state appellate court's opinion reasonable in determining that the prosecutor's comments were

not impermissible, but the trial court ultimately gave the proper jury instructions regarding

reasonable doubt and the prosecution's burden of proof.

As to the latter portion of the prosecutor's rebuttal in which he stated that Mathews'

inconsistent statements about which of the robber's calf had a tattoo were not enough to raise a

reasonable doubt, petitioner claims that the prosecutor's statement misstates the reasonable doubt

standard.  However, the California Court of Appeal rejected petitioner's claim, finding that the

claim was waived because defense counsel failed to object.  It further found that the prosecutor's

statement was not incorrect or impermissible.  Moreover, the jury was instructed that it was to

base its decision on the evidence presented, counsel's arguments were not evidence, and the jury

1  was not permitted to automatically reject testimony merely because of inconsistencies or

2  conflicts.  See CALCRIM Nos. 220, 222, 226.

3       The court has reviewed the record and concludes that the state court's rejection of this

4  claim was not contrary to, or an unreasonable application of, clearly established Supreme Court

5  law.

6                B.      Likening jury's task as ordinary and reasonable

7       At the beginning of closing argument, the prosecutor stated, "So I took my closing

8  statement and I dropped it in the recycle bin and I said I'm done with all the lawyering because it

9  is unfair to you to let the court proceedings get in the way of themselves.  So what I'm going to

10  do, what I'm going to use this opportunity to do is to talk with you about common sense, about

11  your common experiences, your life experiences and how that tells you exactly what happened in

12  this case.  We are not going to let common sense die here."  The prosecutor later stated, "I want

13  to give you a hypothetical just so you understand that the common sense out there is common

14  sense in here.  Okay?  What's reasonable out there is reasonable in here."  Later, the prosecutor

15  also told the jury, "And this is where I want to bring you back to your common sense.

16  Reasonable out there; reasonable in here."  (Pet., Ex. 1 at 32.)

17       Petitioner claims that these statements diminished the reasonable doubt standard to one of

18  reasonableness.  The state appellate court rejected this allegation, finding that defense counsel

19  waived it by failing to object.  In the alternative, the court concluded that urging the jury to use

20  its common sense in evaluating evidence was a "fair comment."  (Id.)  Further, CALCRIM No.

21  226 also directed the jury to use its common sense and experience.  (Id.)  Finally, as stated

22  above, the jury was properly instructed on the beyond a reasonable doubt standard.

23       The state court's rejection of this claim was not contrary to, or an unreasonable

24  application of, Boyd or Darden.  Thus, petitioner is not entitled to habeas relief on this claim.

25                C.      Comments Disparaging Defense Counsel

26       Petitioner claims that during arguments to the jury, the prosecutor maligned the character

27  of petitioner's defense team in three instances.  First, petitioner's public defender, Joe Solga,

28  who represented petitioner on the issue of the lineup with the Napa Police, testified for the

1    defense at trial. (Pet. at 18.) Solga had testified that he advised petitioner not to participate in

2    the lineup because Solga felt there were certain legal deficiencies in the police department's

3    procedures. However, the prosecutor stated, "Enter Joe Solga. Defendant's lawyer. Whose job,

4    by his very own admission, is to help this man avoid responsibility." (Id.) After defense counsel

5    objected, the trial court sustained the objection.

6         The California Court of Appeal rejected this claim. The court noted that during cross-

7    examination, in response to a question, Solga admitted that his job was to help petitioner avoid

8    criminal conviction and that in general, Solga's job was to protect guilty people and "help[]

9    guilty people avoid conviction." (Pet., Ex. 1 at 33-34.) Relying on state case law, the state

10   appellate court concluded that the prosecutor's characterization of Solga's testimony was not

11   unwarranted, nor was it misconduct. Further, because the trial court sustained the objection, any

12   potential harm was minimized in light of the court's instruction to disregard statements to which

13   an objection was sustained. (Id.)

14        A prosecutor may not gratuitously attack a defense counsel's integrity and veracity. See

15   Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983) (prosecutor's comments attacking

16   integrity of defense counsel without evidence improper and error of constitutional dimension).

17   Nor may the prosecutor attack defense counsel's legitimate trial tactics. See United States v.

18   Frederick, 78 F.3d 1370, 1379-80 (9th Cir. 1996) (prosecutor's back-handed compliment to

19   defense lawyer for confusing witness, which appeared to imply that his methods were somewhat

20   underhanded and designed to prevent truth from coming out, was improper but not alone

21   reversible error). However, Brecht requires that a state prisoner show that an error had a

22   substantial and injurious effect or influence in determining the jury's verdict in order to warrant

23   federal habeas relief.

24        Here, the record demonstrates that the prosecutor's statements were, in fact, based on

25   Solga's admissions that Solga considered it to be his job to protect guilty people and help guilty

26   people avoid conviction. This was not a situation where the prosecutor attacked Solga without

27   specific evidence in the record upon which the prosecutor commented. See, e.g., Bruno, 721

28   F.2d at 1194 ("the prosecutor offered nothing from the evidence adduced at trial to support his

1   suspicions that defense counsel had agreed for the sake of profit to aid in fabricating a defense").

2   Thus, the court finds that the state court's conclusion that the prosecutor's comment did not

3   amount to prosecutorial misconduct was reasonable.

4       The second instance of petitioner's prosecutorial misconduct claim occurred later, when

5   the prosecutor commented again on petitioner's refusal to participate in the Napa lineup.  The

6   prosecutor stated that an innocent man would want to stand up in the lineup to show that he was

7   not guilty, "[u]nless, of course, you are the robber.  And then what you do is you put as much

8   time and as much distance and as many lawyers as you can find between you and the truth[.]"

9   (Pet., Ex. 1 at 35.)

10      The state appellate court concluded that this claim was waived because defense counsel

11  failed to object.  The Ninth Circuit has recognized and applied the California contemporaneous

12  objection rule in affirming denial of a federal petition on grounds of procedural default where

13  there was a complete failure to object at trial.  See Inthavong v. Lamarque, 420 F.3d 1055, 1058

14  (9th Cir. 2005).  Thus, the court denies this claim based on procedural default.

15      Finally, petitioner alleges that the prosecutor committed misconduct when he spoke about

16  defense counsel and stated, "I think she has done an admirable job, but you have to realize she

17  has a tough job to do in defending a guilty person."  (Pet., Ex. 1 at 36.)  The state appellate court

18  rejected petitioner's claim, on the basis that "a prosecutor is free to give his opinion on the state

19  of the evidence."  Further, the state court noted that just after this statement, the prosecutor went

20  on to discuss the evidence that the prosecutor argued supported petitioner's guilt.  Thus,

21  concluded the state court, read in context, the prosecutor's statement was not improper.

22      Even assuming any of these allegations of prosecutorial misconduct were meritorious,

23  petitioner would still have to demonstrate that the error resulted in a substantial and injurious

24  effect on the verdict.  Here, however, the convictions for the second degree robbery at Round

25  Table Pizza, attempted second degree robbery at Peggs Grill, and attempted second degree

26  robbery at Rasputin Records were supported by overwhelming evidence of guilt with several

27  consistent eyewitness testimonies.  The court therefore concludes that the state court's rejection

28  of petitioner's prosecutorial misconduct claims was not contrary to, or an unreasonable

1    application of, clearly established Supreme Court law.

2                    D.      Violation of Court Rulings

3            Petitioner claims that the prosecutor committed misconduct by repeatedly referencing

4    Woody Mazza, petitioner's half brother, during questioning of petitioner's mother, and also in

5    closing argument, despite the court's admonitions.

6            After defendant's mother confirmed that he had a half brother named
             Woody, the prosecutor asked if Woody had been to prison for robbery. Defense
7            counsel's objection was sustained and the witness nonetheless answered,
             "That's not true." The trial court told the prosecutor, "Mr. Feinberg, cut it out"
8            and said, "We are not here to try Woody Mazza for anything, and whether he
             does or doesn't have a record is not relevant here. Cut it out." The prosecutor
9            then asked defendant's mother, "Mrs. Mazza, isn't it true that Woody Mazza
             went with [defendant] to do a robbery at Paradise 33?" Defense counsel's
10           objection was sustained to this as well. The trial court denied motions for
             retrials, but admonished the prosecutor that "we are done with this line of
11           questioning with this witness and I intend to admonish the jury to disregard all
             of this." The trial court then instructed the jury as follows:

12
             "[Y]ou heard insinuation from the District Attorney to the effect that the
13           defendant's half brother may have been involved in one of the robberies, may
             have had some kind of criminal record or something like that. You've heard no
14           evidence to that effect. If the District Attorney thought that – if the District
             Attorney's theory of the case was that [defendant] did the Paradise 33 robbery
15           in conjunction with his half brother, then the District Attorney should have
             presented you with evidence of that. There has not been one iota of evidence
16           that implicates Woody Mazza in anything whatsoever. He is not on trial here
             today. So you should simply disregard that and remember what I told you that a
17           question asked by an attorney is not evidence."

18           In further discussions outside the presence of the jury, the court stated,
             "I think the prosecution is on thin ice with respect to the Paradise 33 incident."
19           The court also said, "I've already told the jury that there is no evidence
             whatsoever to support that theory. If you think that you have some, I want to
20           hear about it before you put it on before the jury. Otherwise, I don't want to
             hear Woody's name again." The prosecutor indicated that he understood the
21           court.

22           Nonetheless, the prosecutor again referred to "Woody" during closing
             argument. He said: "Now, the judge provided you with an instruction about a
23           second perpetrator and not to concern yourself with a second perpetrator
             because we know that there was a second perpetrator. The witnesses tell us
24           about the second perpetrator inside the car right here at Paradise 33.[¶] For our
             purposes, let's call this Toy Story, the movie. Toy Story, the movie. Because
25           unless you are talking about Toy Story, the movie, I don't want to hear anything
             about Buzz Lightyear and I don't want to hear anything about Woody. All
26           right?"

27           The court overruled defendant's objection. During a break in the
             proceedings, defense counsel again objected to the prosecutor's reference to
28           "Woody." The trial court told the prosecutor that it "wasn't at all happy with

your reference to Woody. If I had seen it coming, I would have shut it down."
The court stated that it "didn't do anything in response to the objection, frankly,
because I didn't want to draw attention to it any further." The prosecutor stated
that he was simply reiterating the court's instruction that the jury was not to
consider uncharged suspects.

   At defendant's request, the court gave the jury the following
admonition: "I want to comment on one thing that [the prosecutor] said this
morning. You had heard – well, he made a reference to the movie Toy Story.
You should simply disregard that. It is stricken. You should pay no attention to
it. [¶] During the course of the trial, you did hear a mention of somebody named
Woody, but you also heard me tell you that you should disregard that. There
simply is no evidence that anyone named Woody was involved in any of these
crimes. [¶] We don't allow lawyers to proceed by a wink and a nod. But in this
case, there simply isn't even anything to wink and nod to you about. Ignore that
comment."

   The trial court subsequently denied defendant's motion for a new trial on
the Paradise 33 charges based on a claim of prosecutorial misconduct. The
court stated its belief that misconduct had occurred, but that it had adequately
remedied the misconduct by admonishing the jury to disregard any suggestion
that "Woody" was the second perpetrator of the Paradise 33 robbery.

(Pet., Ex. 1 at 39-41.)

   The California Court of Appeal concluded that, while the prosecutor did indeed commit

misconduct by continuing to reference Woody even after the court warned him not to, in light of

the trial court's admonitions to the jury, the jury's not guilty verdict regarding the attempted

murder charge at Paradise 33, and the trial court's ultimate grant of a new trial on Counts 5 and

6, petitioner did not establish prejudice.

   For those same reasons, and because petitioner does not set forth any specific argument

as to how the prosecutor's statements resulted in a substantial or injurious effect on the verdict,

this court concludes that the state court's rejection of petitioner's claim was not contrary to, or an

unreasonable application of, clearly established Supreme Court law.

   3. Ineffective Assistance of Counsel

   Petitioner alleges that, for those claims that were denied by the California Court of

Appeal because defense counsel waived them by failing to object, defense counsel provided

ineffective assistance. Specifically, petitioner alleges that counsel was ineffective when he failed

to object to the prosecutor's reference to the cat puzzle in discussing the witness' confusion

about which of the robber's calves was tattooed; the prosecutor's direction to the jury to use

1    reasonableness and common sense; and the prosecutor's comment about why petitioner did not

2    participate in the Napa lineup.

3          A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

4    Amendment right to counsel, which guarantees not only assistance, but effective assistance of

5    counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth

6    Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he

7    must establish that counsel's performance was deficient, i.e., that it fell below an "objective

8    standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, he

9    must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a

10   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

11   would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to

12   undermine confidence in the outcome.  Id.  Where, as here, the petitioner is challenging his

13   conviction, the appropriate question is "'whether there is a reasonable probability that, absent the

14   errors, the factfinder would have had a reasonable doubt respecting guilt.'"  Hinton v. Alabama,

15   134 S. Ct. 1081, 1089 (2014) (quoting Strickland, 466 U.S. at 694).

16         With respect to petitioner's allegations that counsel was ineffective when he failed to

17   object to the prosecutor's reference to the cat puzzle in discussing the witness' confusion about

18   which of the robber's calves had a tattoo and the prosecutor's direction to the jury to use

19   reasonableness and common sense, the state appellate court analyzed those claims on the merits,

20   despite the fact that they were waived, and rejected them for the reasons already stated.  Thus,

21   based on the state court's analysis and rejection of those claims, and this court's conclusion that

22   the state court's decision was reasonable, there is not a reasonable probability that petitioner was

23   prejudiced by any error by counsel.

24         Finally, with respect to petitioner's allegation that the prosecutor improperly commented

25   on why petitioner did not participate in the Napa lineup, the state court concluded that defense

26   counsel was not ineffective for failing to object.  Even assuming the comment was improper, the

27   state court reasoned that defense counsel responded to the prosecutor's comment in his own

28   closing argument.  Choosing to attack the prosecutor's argument in that manner rather than by

raising an objection, is a matter of trial tactics.  (Pet., Ex. 1 at 35-36.)  Trial tactics are not normally reviewable on appeal.  (Id.)

"There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Harrington v. Richter, 131 S. Ct. 770, 790 (2011) (citations omitted).  Federal courts should not overlook the "wide latitude counsel must have in making tactical decisions;" therefore, there are no "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness."  Cullen v. Pinholster, 131 S. Ct. 1388, 1406-07 (2011).  Here, petitioner offers no argument as to why counsel's choice to address the prosecutor's statement in his own closing argument rather than object to the statement was unreasonable.  Petitioner also has not offered any argument as to how he was prejudiced by this choice.

Accordingly, the state court's rejection of petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

**CONCLUSION**

The petition for a writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights, or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

The clerk shall terminate all pending motions, enter judgment, and close the file.

IT IS SO ORDERED.

DATED:   9/29/2015

RONALD M. WHYTE
United States District Judge